IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **PEGGY LEE MORSE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 11-728-DRH-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to Chief Judge David R. Herndon pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Peggy Lee Morse seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.[1]

## Procedural History

Ms. Morse applied for benefits in April, 2008, alleging disability beginning on November 24, 2007. (Tr. 123, 128). The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Karen McCoy denied the application on February 2, 2010. (Tr. 12-21). Plaintiff's request for review was denied by the Appeals Council, and the

---

[1]The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

February 2, 2010, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

(1) The ALJ failed to consider the side effects of her medications.

(2) Remand is warranted because plaintiff submitted new and material evidence after the ALJ's decision which indicates that her chronic obstructive pulmonary disease may meet a Listing.

(3) The ALJ erred in her determination of plaintiff's credibility.

## Applicable Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged

to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant has a severe impairment but does not meet or equal a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner bears the burden of showing that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**   Thus, the question for the Court is not whether Ms. Morse was, in fact, disabled during the relevant time period, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**

This Court uses the Supreme Court's definition of "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**  In reviewing for

substantial evidence, the entire administrative record is taken into consideration, but this Court does **not** reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ McCoy followed the five-step analytical framework described above. She concluded that plaintiff had not worked since the alleged date of onset. At step two, she determined that plaintiff has severe impairments of chronic obstructive pulmonary disease (COPD), degenerative changes of the lumbar spine and muscle spasms of the cervical spine. She found that Ms. Morse's alleged knee pain, migraine headaches and mental impairment were not severe. She found that plaintiff's impairments do not meet or equal a listed impairment. (Tr. 14-17).

The ALJ concluded that plaintiff had the residual functional capacity (RFC) to perform a limited range of light work. (Tr. 17-20). Based on the testimony of a vocational expert, the ALJ determined that plaintiff, who was then 42 years old, was not disabled because she could do her past work as a deli cutter/slicer and a retail cashier. (Tr. 20).

### The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff. As Ms. Morse has not raised an issue with regard to her mental impairments, the Court will not review that evidence in any detail.

**1.     Agency Forms**

Ms. Morse was born in August, 1967.  She was insured for DIB through September 30, 2012.  (Tr. 142).  Her earnings records showed sporadic earnings.  Out of the 10 years prior to the alleged onset of disability, she made less than $1,000.00 per year in 3 years and made more than $10,000.00 in only 1 year.  She had zero earnings for the years 1997, 1998, 2000 and 2006.  (Tr. 136).

Plaintiff's past work included cashier and deli worker in convenience and grocery stores, operator in a factory and personal attendant.  (Tr. 170-177).

She obtained a GED in 1986 and was not in special education classed in school.  (Tr. 151).

Ms. Morse made a prior claim for DIB, which was denied on February 9, 2006.  (Tr. 155).

In an Activities of Daily Living Questionnaire, plaintiff said that she had pain from her ankles to her head, and she was not able to do much other than sit around.  (Tr. 160).  She said that her pain was "unbearable" and interfered with her sleep.  (Tr. 161).  She prepares simple meals every 3 or 4 days, and does not do many household chores due to pain.  She did not drive because she had blackouts.  In response to a question about how far she could walk, she wrote "I can't."  She said she could pay attention for only 5 to 10 minutes.  (Tr. 162-166).

**2.     Evidentiary Hearing - January 13, 2010**

Plaintiff was represented at the hearing by an attorney.  (Tr. 32).  Counsel amended the alleged onset date to November 26, 2007.  (Tr. 47-48).

Ms. Morse testified that she lived with her boyfriend and her six-year-old granddaughter.  (Tr. 37-38).  She has had custody of the granddaughter since 2006.  (Tr. 39).  She last worked on

November 24, 2007, doing home health care. She does not have any certificate or license in that area. (Tr. 40). She had also worked at a convenience store, working the cash register or making sandwiches in the deli. (Tr. 40). Before that, she worked as a case print operator in a factory. (Tr. 41).

She used marijuana once or twice a month. (Tr. 39). She smoked 14 or 15 cigarettes a day. (Tr. 42). Her doctors have told her that she should stop smoking. (Tr. 65). She went to the emergency room a year and half earlier for breathing problems. (Tr. 64).

Ms. Morse testified that she was the primary caretaker for her granddaughter. She does some cooking and can wash dishes if she takes breaks. Other chores just don't get done if she can't do them. Her boyfriend does laundry and grocery shopping. (Tr. 43-44).

Plaintiff testified that her medications cause her to be sleepy. She delays taking her morning medications until she gets her granddaughter off to school. After her medications kick in, she goes back to sleep until about 1:00 p.m. (Tr. 48). She testified that she did not tell her doctor that her medications caused excessive sleepiness because it says on the bottle that it might do so, and she "thought it was a normal thing." (Tr. 64).

Plaintiff testified that she gets 2 to 3 migraines a month. Each lasts anywhere from 4 to 7 hours. When she gets a migraine, she takes medication and lays down with a rag over her face. The migraines are accompanied by nausea and vomiting. (Tr. 49-50).

She has pain in her neck, low back, hip and both legs. She can only stand for 3 to 4 minutes and sit for 10 to 15 minutes. She can only walk about 1/8 of a mile. She could bend over to pick something up if she went slowly. She could not squat. Both of her knees burn. (Tr. 52-55). She estimated that she could lift maybe 5 to 10 pounds at the most. (Tr. 57).

James Lanier testified as a vocational expert. In response to a question by the ALJ, Dr. Lanier testified that a person who could do light work (occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk or sit for 6 out of 8 hours), limited to occasional climbing of ramps and stairs, bending, stooping, kneeling, crouching and crawling, with no ladders, ropes or scaffolds, could do plaintiff's past work as a cashier and deli cutter/slicer. (Tr. 60). Adding the limitation of avoiding concentrated exposure to chemicals, fumes, dust and gasses would not change the answer. (Tr. 65-66).

**3.     Medical Records**

Ms. Morse went to the emergency room on November 26, 2007, complaining of pain in the ride side of her neck, right shoulder, right buttock and leg which began after "catching self on a rail while going down 6 steps." She had a past medical history of emphysema, arthritis in both legs and migraines. The diagnosis was muscle strain. She was given Flexeril and Darvocet and instructed to use heat on her back. (Tr. 245).

She was seen by primary care physician Dr. Liu at Rural Health, Inc., on November 28, 2007. She said that she hurt her right shoulder and back when she tried catching herself on the stairs. She also said that she had migraine headaches with nausea, vomiting and blurred vision. On exam, her neck was supple. Her breathing was normal and her lungs were clear. She had tenderness over her right shoulder area and right upper back. She also had tenderness over her right knee with no significant limitation of movement. The assessment was possible muscle strain afer fall and possible osteoarthritis in the knee. She was prescribed Naproxen and Vicodin. For the migraines, she was prescribed Propranolol and Relpax. (Tr. 227).

She returned to Rural Health on December 19, 2007. She reported that her migraines had

gone away since she had been taking Propranolol. She still had pain in her right shoulder and knee. On exam, she had tenderness in her right shoulder and lower lumbar spine. She had mild tenderness over her right knee. (Tr. 225).

She again went to the emergency room on January 8, 2008, for neck pain and muscle spasm which began after she had been playing with her granddaughter. On exam, she had muscle spasms and decreased range of motion of the neck. Her back was normal, with no tenderness or limitation of the range of motion. The diagnosis was acute cervical strain. (Tr. 237-240). X-rays of the right shoulder were normal. (Tr. 236).

On January 17, 2008, Dr. Liu noted that she had been referred to pain management in the past for knee pain, but said she could not go because of the travel. She still had right shoulder tenderness and limitation of movement. Vicodin was prescribed. (Tr. 224). She again complained of right knee pain and right low back pain in February, 2008. She was referred to Paducah Pain Management. (Tr. 223-224).

On April 10, 2008, x-rays of the cervical spine showed "mild loss of the normal lordosis suggestive of paraspinal muscle spasm." (Tr. 235).

In May, 2008, plaintiff saw Dr. Liu for knee and back pain. She said that Flexeril and Vicodin helped and she wanted refills. She said that "she did not notice any side effects from those medicines." (Tr. 288).

A psychologist performed a mental status exam on June 24, 2008. He reported that Ms. Morse told him that she lived with her boyfriend, her younger brother and her four-year-old granddaughter. DCFS had awarded her custody of the granddaughter. Ms. Morse told him that her activities included helping with laundry, making easy meals, watching TV and reading. Her

granddaughter needed help with "picking out her clothes, hygiene, etc." There were 5 pit bulls at the home, which Ms. Morse helped care for. She said that she had become more sedentary because of her medical problems. (Tr. 281-282).

She returned to Dr. Liu on July 2, 2008 with urinary complaints and complaints of continuing knee and back pain. She had also developed ankle pain. She had missed her appointment at pain management because she could not find the office. She said that Vicodin "helped her." Dr. Liu's note says that she denied "any side effects from Vicodin including dizziness, nausea, vomiting or constipation." Her prescriptions were refilled. (Tr. 287).

Ms. Morse continued to see Dr. Liu about once a month or so from August, 2008, through November, 2009. She continued to complain of chronic pain in her back and knees. Examinations generally showed tenderness of the back and knee. Dr. Liu continued to prescribe Vicodin and Flexeril. (Tr. 306-323). In August, 2008, she said her migraines were "significantly improved" since she had been taking Propranolol. (Tr. 318). She "[d]enied any side effects" from Vicodin or Flexeril in September, 2008. (Tr. 317).

In October, 2008, a CT scan of the cervical spine was normal. (Tr. 343). A CT of the lumbar spine showed no "acute findings." She had a mild disc bulge with mild impression on the thecal sac at L4-5, and mild disc protrusion at L5-S1. (Tr. 345).

In December, 2008, Ms. Morse told Dr. Liu that pain management had recommended that she get a shot in her back, but she could not get a ride. She said that she was not happy with the pain management doctor and she wanted Dr. Liu to continue to prescribe Vicodin for her. Dr. Liu told her not to drive or operate machinery if she was taking Vicodin or Flexeril and to watch her side effects and let him know if she had any new side effects. (Tr. 315). In January, 2009,

she told him that she did not like to take Vicodin in the daytime as it made her sleepy. She did not want to go back to pain management. She was using an inhaler for COPD, and Dr. Liu told her to quit smoking. (Tr. 314). In February, 2009, Dr. Liu told her that pain management was a better place to manage her pain, but she "declined it." (Tr. 313). In March, 2009, she said she had gone to the emergency room for left knee pain and had been given a brace. Her migraines were well controlled. She was again told to quit smoking. (Tr. 312).

Union County Hospital records indicate she came to the emergency room complaining of left knee pain on March 14, 2009. On physical examination, her neck and back were normal and non-tender. Her breath sounds were normal. (Tr. 351). X-rays of the left knee were normal. (Tr. 354). She was given an Ace wrap and Naprosyn and released. (Tr. 352-353).

In July, 2009, Dr. Liu again told her to watch for side effects of medicine. No side effects were noted. (Tr. 310). In August and October, 2009, she said that Flexeril and Vicodin helped with her pain and she wanted refills. There were no side effects noted. (Tr. 309). In November, 2009, Ms. Morse told Dr. Liu that she had started walking 2 and ½ miles to pick up her granddaughter from school in the afternoon for exercise. She was having more knee pain and muscle spasms in her back. She said that Vicodin twice a day was "okay," but she wanted to increase the dosage of Flexeril. On exam, she had tenderness in her low back and knees. She had no redness, swelling or warmth in her joints. Her breathing was normal and her lungs were clear. No side effects were noted. (Tr. 307).

Ms. Morse was seen by a psychiatrist at Rural Health, Inc., from April through December, 2009. She was diagnosed with bipolar disorder and treated with medication. (Tr. 324-334). On the fist visit, she told the doctor that she had "no intention at this time to quit" smoking. (Tr.

334). At the last visit, she had no limitations in concentration, attention, memory, insight, intellect or judgment. (Tr. 325).

**4.    Residual Functional Capacity Assessment**

On June 9, 2008, state agency consultant Towfig Arjmand, M.D., completed a Physical RFC Assessment. This assessment was based on a review of medical records. He concluded that plaintiff had the physical RFC to perform a full range of work at the light level (frequent lifting of 10 pounds and occasional lifting of 20 pounds with ability to sit, stand, or walk for 6 out of 8 hours, and unlimited ability to push/pull). He noted that she had a history of pain in her neck, back, right knee and shoulder. He acknowledged her history of COPD, but pointed out that there had been no notations of difficulty breathing in the last 12 months and her lungs had been clear on the most recent examination. (Tr. 269-276).

The RFC assessment was affirmed by a second state agency consultant on October 10, 2008. (Tr. 303-305).

**Analysis**

Plaintiff's first point is that the ALJ misconstrued or ignored the evidence regarding side effects of her medication. Specifically, she testified at the hearing that her medications put her to sleep. She said that she takes her medication after her granddaughter leaves for school, and she sleeps from the time they kick in until 1:00 p.m. If she takes more medication in the afternoon, she lays on the couch and sometimes goes back to sleep. (Tr. 48-49). However, the ALJ stated that she denied "any side effects from pain medication," citing to specific pages in Dr. Liu's records. See, Tr. 15. She also observed that the medical records indicate that plaintiff's medications have been "relatively effective" in controlling her pain. See, Tr. 18.

-11-

In assessing the credibility of a claimant's allegations of pain, the ALJ is required to consider a host of factors, including the "type, dosage, effectiveness, and side effects of any medication you take...." 20 C.F.R. §404.1529(c). See also, SSR 96-7p.

As the ALJ pointed out, Dr. Liu recorded the absence of any side effects on numerous visits. At the hearing, plaintiff testified that she did not tell Dr. Liu that her meditations made her sleepy because the pill bottles warn of sleepiness and she "thought it was a normal thing." (Tr. 64). She also said that, when the doctor asked her about side effects, he was asking about "bowel movement problems." (Tr. 46).

Plaintiff's argument here is premised on the belief that the ALJ was required to accept her after-the-fact explanation for why she did not tell Dr. Liu that her medications made her excessively sleepy. This is incorrect.

As is detailed in the above review of the record, Dr. Liu recorded the fact that he repeatedly cautioned plaintiff about side effects and instructed her to report side effects to him. Out of all her visits to Dr. Liu, she told him only once that Vicodin made her sleepy. Contrary to plaintiff's position, Dr. Liu recorded that, on other visits, she repeatedly denied *any* side effects from her medications, and not just side effects related to bowel movements. See, Tr. 287, 317. On one visit, she told Dr. Liu that Vicodin "alleviated the pain and made her more functional." (Tr. 318). And, in November, 2009, she affirmatively told him that taking Vicodin twice a day was "okay" and she wanted to increase her dosage of Flexeril See, Tr. 307.

At most, there was a conflict in the evidence about whether plaintiff's medications made her excessively sleepy. Plaintiff's argument is an invitation to reweigh the evidence, which this Court cannot do. It is the function of the ALJ, and not this Court, to weigh the evidence and

decide such conflicts, and this Court cannot substitute its judgment for that of the ALJ. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). Simply put, while the ALJ could have credited plaintiff's explanation for why she did not tell Dr. Liu that her medications made her sleep for hours during the day, she was not required to accept that explanation.

Plaintiff's second point concerns a spirometry report dated March 3, 2010, which she submitted to the Appeals Council as "new and material evidence." (Tr. 208-218). The Appeals Council denied review. (Tr. 1). Plaintiff acknowledges that this report is "incomplete," but asserts that "the results raise a red flag as to the severity of the plaintiff's COPD." See, Doc. 15, pp. 6-7.

Plaintiff's argument as to the relevance of the post-decision evidence is somewhat imprecise. Since the spirometry test was done after the ALJ rendered her decision, it obviously cannot be considered by this Court on the issue of whether the ALJ's decision was supported by substantial evidence. *Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993). Further, this Court cannot review the question of whether the Appeals Council's denial of review was correct because, pursuant to **42 U.S.C. § 405(g)**, this Court reviews the "final decision of the Commissioner of Social Security." When the Appeals Council denies a request for review, as happened here, the decision of the ALJ becomes the final decision of the Commissioner. Therefore, it is the decision of the ALJ which is reviewed by this Court. **20 C.F.R. §404.981;** *Eads*, **983 F.2d at 816.**

The Court may consider the issue of whether an Appeals Council order refusing to consider additional evidence review was the result of a mistake of law. *Eads*, **983 F.2d at 817.** An example of a such a mistake of law is a determination by the Appeals Council that additional

evidence submitted to it does not constitute new and material evidence.  See, *Nelson v. Bowen*, **855 F.2d 503, 506-08 (7th Cir.1988); *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997).** Here, despite plaintiff's vague suggestion to the contrary, the Appeals Council did not refuse to consider the additional evidence.  As is set forth in its denial letter, the Appeals Council considered the additional evidence, but "found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 1-2, 4).  The decision of the Appeals Council denying review, as opposed to an order refusing to consider additional evidence, is within the discretion of the Appeals Council.  It is not the final decision of the Commissioner, and is not subject not subject to review by this Court.  **42 U.S.C. § 405(g);  *Perkins*, 107 F.3d at 1294**

That leaves only the possibility that the spirometry test is new and material evidence which provides grounds for remand pursuant to sentence six of **42 U.S.C. §405(g)**.

The Court may order a remand pursuant to sentence six for the consideration of additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding...." **42 U.S.C. § 405(g)**.  In this context, evidence is material where "there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *Perkins*, **107 F.3d at 1296, and cases cited therein**.  Here, there is no such reasonable probability because the spirometry test does not meet the applicable regulatory requirements.

The requirements for spirometric testing are set forth at 20 C.F.R. pt. 404, Subpt. P, App. 1, §3.00E.  The requirements for valid testing include post-bronchodilator testing, or, in the

absence thereof, a statement as to why a bronchodilator could not be administered. Further, the report should contain a statement as to the patient's ability to understand the directions and her effort and cooperation in performing the test. Plaintiff acknowledges that the March 3, 2010, report does not contain any of this information. See, Doc, 15, p. 6; Tr. 216-218. Because the test does not meet the regulatory requirements of valid testing, there is not a reasonable probability that the ALJ would have determined that plaintiff was disabled due to her COPD had she considered the March 3, 2010, test.

Lastly, plaintiff takes issue with the ALJ's credibility determination. She correctly points out that ALJ McCoy used the boilerplate language that has been repeatedly criticized by the Seventh Circuit. See, ***Shauger v. Astrue*, __ F.3d __, 2012 WL 992100, \*4 (7th Cir. 2012), and cases cited therein.** However, it is not the use of the boilerplate language in and of itself which is objectionable; it is the use of the boilerplate language unaccompanied by findings which are supported by evidence in the record. ***Shauger, ibid***.

Here, ALJ McCoy gave six valid reasons for finding that plaintiff was exaggerating the intensity, persistence and limiting effects of her pain and other symptoms. Her work history was sporadic, suggesting that there were reasons other than disability for her lack of work. Her testimony that she had very limited daily activities was contradicted by statements she made to the psychologist who examined her. She went for periods of time without refilling her medications. She refused to go to pain management as directed by Dr. Liu. The medical records indicated that her medications were effective in controlling her symptoms. The ALJ was entitled to consider these factors. 20 C.F.R. §404.1529(c)(3)&(4). Lastly, the objective medical evidence did not indicate severe problems. This is a proper consideration since "discrepancies

between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Plaintiff takes issue with only two of the ALJ's reasons. She argues that the ALJ ignored the various reasons that she gave to Dr. Liu for refusing to go to pain management. It is true that Ms. Morse gave Dr. Liu several different reasons for why she did not go to pain management, ranging from inability to get a ride to being unhappy with the pain management doctor. Be that as it may, the fact remains that she ultimately declined to go to pain management and said she just wanted to continue having Dr. Liu prescribe Vicodin for her. (Tr. 315). The ALJ could reasonably consider this factor in determining whether to believe plaintiff's claim that she had debilitating pain.

Plaintiff also argues that the ALJ misstated her testimony regarding the frequency of her migraines. However, the ALJ correctly pointed out that the medical records document that her migraines were well controlled with medication. (Tr. 15). Plaintiff does not dispute the accuracy of the ALJ's observation. Whether she testified that she had one or four migraines a month, the ALJ validly observed that Dr. Liu recorded the fact that her migraines were significantly improved and well controlled with medication.

The ALJ considered the relevant factors regarding plaintiff's credibility, and the reasons she gave for her findings were supported by evidence in the record. The fact that she did not weigh the factors the way plaintiff would like does not mean that her credibility determination was legally insufficient. Plaintiff has not demonstrated any error with regard to the credibility findings. As the ALJ's credibility findings were not "patently wrong," they should not be overturned. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). See also, *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010), holding that credibility findings should not be overturned where

the ALJ "thoroughly examined the evidence and clearly articulated his findings."

## Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made. Therefore, this Court recommends that the final decision of the Commissioner of Social Security, denying plaintiff Peggy Lee Morse's application for disability benefits, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **May 7, 2012**

**Submitted: April 20, 2012.**

        **s/ Clifford J. Proud**
        **CLIFFORD J. PROUD**
        **UNITED STATES MAGISTRATE JUDGE**